**The People of the State of Illinois, Defendant in Error, v. Leroy Walker, Plaintiff in Error.**

**Gen. No. 50,136.**

First District, Fourth Division.

February 10, 1965.

 █

John T. Chadwell, Jr., and Chadwell, Keck, Kayser, Ruggles & McLaren, of Chicago, for plaintiff in error.

William G. Clark, Attorney General, of Springfield (Daniel P. Ward, State's Attorney, of Chicago, Fred G. Leach and George Kenny, Assistant Attorneys General, Elmer C. Kissane and Joseph V. Roddy, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Defendant appeals from a conviction of murder and the sentence of fourteen years, after a bench trial.[1] He urges that he was not proved guilty beyond a reasonable doubt but that in any event he was guilty of manslaughter and not murder.

The testimony of Albert McClinton, the State's main witness, reveals that on the night of June 2, 1961, he, Claude Jenkins, a Mrs. Brown and the defendant were drinking and talking on a porch at 3310 South Indiana Avenue in Chicago; that a man he did not know, John Stenneth (hereinafter referred to as the deceased), approached and demanded that they gamble; that when he was refused he drew a knife and started

[1] The writ of error proceeding was transferred by the Supreme Court to this court.

toward them; that McClinton grabbed two bottles and told deceased he would hit him if "you comes up on me with that knife"; that defendant and Jenkins told McClinton to come back but that every time he turned deceased ran up and tried to cut him; that defendant and Jenkins came up and backed deceased down the street; that deceased was cutting at both of them but that he did not see either defendant or Jenkins get cut. McClinton further testified that defendant threw a brick which hit deceased and knocked him down; that all three ran up and stood around the deceased; that defendant picked up deceased's hand with the knife in it and said "he would cut his throat with his own knife"; that he cut the deceased and walked away. McClinton then said "You shouldn't have cut the man. I told you not to cut the man, I told you not to cut the man" and defendant answered: "You told me not to cut the man. He cut me."

Jenkins' story of the beginning of the incident was corroborative of McClinton's. He also testified, as a court's witness, that when deceased started down the street:

> Leroy [defendant] came up between us and the man started up to him. The man went between the cars and Leroy and I walked down the street toward him and Mac was behind him. The man was swinging the knife.

> Stenneth was swinging the knife. I thought I saw two knives in the man's hand. I ran in between them and pulled Walker back and was cut on the left arm. I noticed I was cut and the blood was running down my arm. I went on upstairs then. I was only a few doors from my house when I got cut. I did not see the man being hit with the brick.

Defendant's testimony tells his version:

I did not know John Stenneth and had never seen him before. I had one shot of gin on the porch and had one beer earlier in the day. I was not intoxicated. When Stenneth came in the yard he used a lot of vulgar language and said he wanted to gamble. I never talked to him but I heard McClinton talk to him.

He pulled out his knife after he put his money back and jumped back and forth.

I saw the knife, it was like the one you have there. I was sitting on the porch at this time on the North side by the bannister. When he pulled the knife, McClinton jumped. When McClinton jumped up, he stepped back. McClinton then left the steps and got the bottles. The man started approaching him and he slapped the bottle against the fence and broke the head off.

The man started backing away from him. He kept the bottle in his hand. The man was a little way from the stairs when McClinton broke the bottle. He backed out to the sidewalk and McClinton walked out towards him. He started walking back but he didn't face his back South. He and McClinton started swinging at each other with the bottles and the knife.

I saw that the deceased had two knives. McClinton did not turn back, he and the man were swinging at each other. I hollered at McClinton and told him to come back. I did not hear Jenkins say anything. McClinton did not come back but he did answer me.

McClinton screamed and said he couldn't get away from the man, that if he tried to leave the man would cut him in the back. This was about 4

295

houses down and I couldn't see too much. I got off the stairs and went down there. I didn't see Jenkins go down. I grabbed McClinton by his arm and told him to come on. He turned and walked back. As we got about two steps, the man ran up to McClinton and I got cut on the arm.

· · · · · ·

I saw that Jenkins had been cut on the arm. But, I didn't see the deceased cut Jenkins. Jenkins ran up about a step ahead of me and the man was cutting.

I did not have a knife. When Jenkins ran up ahead I did not see McClinton. I got close enough to this man to cut him. McClinton got close enough, I guess, to cut him too. They were swinging knives and either one of them could have been cut. Jenkins was about 2 feet from the deceased. I did see blood on Jenkins.

After I got cut, I ran and got a brick and threw it at the deceased. I don't know if the brick hit him or not, but he stopped.

Then I took about 4 steps on him and he started swinging the knife at me again. As he swung the knife in his right hand, I pushed the knife and the knife went back and cut him on the neck.

I did not have the knife in my hand at any time during the struggle.

I did not hit him again with the knife. McClinton was a couple of feet from me when the man was hit with the knife. He was behind me. He did not grab my arm or Stenneth's arm. He did not tell me not to cut the man. The man was not on his knees when this happened.

· · · · · ·

296

I had no contact with this man before I was cut. I did not ask to fight with this man. The deceased did not say anything to me. All he did was cut me and swing at me. It was only after I was cut in the arm that I had any contact with the deceased.

. . . . . .

I did not have any intention to kill Stenneth.

I have no malice against Stenneth and never saw him before this altercation. About 6 minutes elapsed from the time Stenneth first appeared until the time he was cut. I hit the deceased with the brick after I was cut. I picked the brick up in a little vacant lot South of 3310 Indiana.

I had to come back North to pick up the brick. When I was retreating North, the deceased was running up on me with his knife.

On cross-examination he described the actual cutting:

When I threw the brick and hit him with it, he swung his knife at me again. He stopped when I threw the brick. He still had both knives in his hands.

He swung only 1 knife at that time, the knife we have here.

He swung the knife in a side arm motion. As the knife passed me I shoved him by the wrist, but his arm did not stop. I did not have a firm hand on the wrist.

I pushed his arm around and the knife went in the left side. I left him alone and walked up the street. I saw the blood. I didn't know whether there were any cuts or not, but I saw the blood. I saw a little bump where the brick hit him on the

forehead. I didn't see a cut on the right side of his neck.

He was swinging the knife about neck high. He pushed the knife and when his hand came around I shoved him. I grabbed him with just my right arm.

I grabbed him with my right hand.

When the knife went into his neck, the man slid down the fence into a sitting position. Then I walked away.

The coroner's physician testified that his post-mortem examination showed that deceased was under the influence of alcohol and that this fact "could have contributed to his death"; that deceased expired from two stab wounds, one on either side of his neck.

Defendant's main contention is that, under the law, if a killing occurs during the course of a fight and before the blood of the killer has had time to cool, the offense is not murder but voluntary manslaughter. In support of his view, defendant cites People v. Bissett, 246 Ill 516, 92 NE 949:

. . . It is indispensible, before one can be convicted of the crime of murder, that the act be done with malice aforethought, either express or implied. Here the element of malice, under the case as made by the People, was wholly wanting. Under our statute the crime committed could not have been more than manslaughter, which to use the language of the statute, "is the unlawful killing of a human being without malice, express or implied, and without any mixture of deliberation whatever. It must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible.

298

... In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should appear to have been an interval between the assault or provocation given, and the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and punished as murder." [2] That Russell was inflicting upon plaintiff in error a highly provoking injury at the time he voluntarily seized him and demanded he turn over to him the contents of his pocket is clearly shown by the testimony of every witness to the assault. *That from the time the affray began until Russell was shot and killed there was not the slightest pause in the activities of the two men engaged, and not the slightest opportunity offered plaintiff in error to deliberate or reason in regard to the matter, is clearly shown. Under this state of facts the plaintiff in error, if guilty at all, is guilty of no graver offense than that of manslaughter,* and upon motion for a new trial the verdict of the jury should have been set aside. (246 Ill at 521, 522.) (Emphasis supplied.)

Our attention has also been directed to People v. Bartley, 263 Ill 69, 104 NE 1057, where the accused and the deceased had first fought with fists, then struck at each other with garden equipment, and final-

---

[2] A different definition of the crime is contained in the Criminal Code of 1961, but the Code did not go into effect until 1962 and the offense in the instant case was committed in 1961.

■■■■■

ly accused shot the deceased while the latter was threatening him with an ax. The defendant, Bartley, after the exchange with the farm or garden equipment, left the scene of the fight, went into his house and got his gun, and returned to the farm yard where he then shot the deceased to death. The court held, on these facts, that defendant Bartley had not had sufficient time for his blood to cool. In reversing the accused's conviction for murder, and a sentence of nineteen years, the Supreme Court of Illinois held that, at most, the conviction should have been for manslaughter. In so holding, the court said at page 75, 76:

> Besides, the law makes a distinction and allowance between what a reasonable person would do in the heat of passion or under great provocation and what the same person would do in cooler moments, and it is just this distinction that makes a homicide in one case murder and in another case manslaughter . . . [w]hen the evidence utterly fails to establish the crime of murder as charged and shows only manslaughter at most, then a verdict of murder should be set aside. . . .

> There had been a serious and highly provoking injury inflicted upon plaintiff in error sufficient to excite an irresistible passion in a reasonable person, and there was an attempt by Finley to commit a serious personal injury upon plaintiff in error. Can it be said, under all the circumstances of this case, that from the time that the fight started between Finley and the plaintiff in error, the plaintiff in error had at any time prior to the killing, as a reasonable man, any opportunity for deliberation as to the consequences of any of his acts or that there was any mixture of deliberation whatever, or, as stated by the authorities on criminal law, had sufficient time elapsed since the prov-

ocation or injury for the accused to become calm and act coolly with reference to the consequences likely to ensue from his acts? The rule laid down in the American and English Encyclopedia of Law (vol 21, 2d ed p 177), is as follows: "If, however, the difficulty between the accused and the deceased had not terminated but the provocation and the homicide constitute parts of a single transaction, an interval of a few minutes does not constitute sufficient cooling time. An instance of this is where the accused, as soon as the provocation is given, goes a short distance for a weapon and immediately returns and strikes the fatal blow." The homicide in this case was manslaughter, if anything.

Other cases in which the crime was held to be manslaughter are People v. Jones, 384 Ill 407, 51 NE2d 543; People v. Harris, 8 Ill2d 431, 134 NE2d 315.

In the instant case, the deceased was an aggressive, intoxicated belligerent who menaced strangers because they would not gamble with him. According to every witness he kept swinging his knife at one and all. Defendant went to McClinton's aid; defendant had no words with deceased whom he had never seen before; when he was cut by the deceased, he knocked him down by striking him with a brick. It is undisputed that defendant never had a knife. He grabbed deceased's hand with the knife in it and stabbed deceased with the knife in deceased's hand. The affray was a continuous one. It lasted six minutes according to defendant. McClinton testified that:

I don't know exactly how much time elapsed between the time I first saw this man and when Leroy cut him with his own knife. Everything happened pretty fast. I guess it wasn't as long as 15 minutes. It all happened pretty fast.

301

In his summation in the trial court, the Assistant State's Attorney said:

> . . . I think the defendant used too much force in attempting to restrain the attack of the deceased. And I think that after he was attacked and was cut by the deceased, that he became impatient and that is when he performed the stabbing on the deceased.

■ We believe that enough time did not elapse for the voice of reason to return to "cool the blood" of defendant, and that under the circumstances defendant believed or was justified in believing that he was in great danger. People v. Bartley, supra, page 77. Therefore, the finding of guilty of murder must be reversed.

However, it is unquestioned that defendant killed the deceased. It is also clear that the killing was not in self-defense.

■ Defense counsel did not request the trial court to reduce the charge to manslaughter and the record does not disclose whether the court considered a change of charge.

Section 121-9—The Cause on Appeal—of the Code of Criminal Procedure (Ill Rev Stats 1963, c 38, § 121-9), provides in part in subparagraph (a):

> Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.

Subparagraph (b)(4) of that section provides that the reviewing court may "Reduce the degree of the offense of which the appellant was convicted."

The Committee Comments to this subsection state:

> Subsection (b) is, again, consistent with the philosophy of the entire article that, in the interests

302

of fairness and justice to both the defendant and People when the defendant appeals (or the State in those situations authorized by Article 121), and in the interest of reducing the number of appeals and re-trials and delays in each case, the reviewing court should have the power to do complete justice when the case is before it.

The Code of Criminal Procedure, 1963 (ch 38) provides in Section 125-3 (b):

In any case pending on or after the effective date of this Code involving an offense committed prior to such date the procedural provisions of this Code shall govern insofar as they are justly applicable and their application does not introduce confusion or delay.

Therefore under the foregoing sections of the Code of Criminal Procedure, a reviewing court may reduce the degree of the offense and apply it in a pending case such as this.

We find that under the evidence defendant was guilty of voluntary manslaughter and remand the cause to the Circuit Court with directions to enter a finding of guilty of voluntary manslaughter and to impose a sentence for that crime appropriate to the facts and circumstances of this cause and to whatever other matters in aggravation or mitigation may be made available to the trial court.

Reversed and remanded with directions.

McCORMICK, P. J. and ENGLISH, J., concur.