THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RALPH GOOLSBY, Defendant-Appellant.

First District (1st Division)   No. 62452

Opinion filed January 24, 1977.

James J. Doherty, Public Defender, of Chicago (Deborah Michels, Thomas Finegan, and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Joan S. Cherry, and Edward H. Phillips, all of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant, Ralph Goolsby, was indicted for the murder and attempt robbery of William Byrne, a Sun-Times delivery truck driver. Before trial, defendant unsuccessfully moved to suppress various items of blood-stained clothing taken from the home of his mother, Eroline Goolsby. A jury found defendant guilty of murder, but not guilty of attempt robbery. Defendant was sentenced to 30 to 90 years. Defendant appeals, contending (1) that the trial court improperly denied his motion to suppress the introduction of his bloodstained clothing as evidence, (2) that the trial court should not have allowed the State's witness, a forensic pathologist, to conclude that some of the decedent's wounds were "defense wounds," (3) that his right to a fair trial was prejudiced when the prosecutor improperly cross-examined him and made prejudicial statements to the jury in final argument, (4) that the State failed to prove his guilt beyond a reasonable doubt, and (5) that his sentence was excessive.

On February 24, 1973, William Byrne died from a stab wound he suffered during a fight with defendant, Ralph Goolsby, who worked for Byrne as a helper on his delivery truck. At 7:30 p.m. on the night of the incident, James Caruso, a student at the University of Illinois, saw a Sun-Times truck moving north on South Wentworth Avenue in Chicago. The truck was "switching and weaving" and came to rest against a fence at approximately 25th Street. He passed the truck, turned around, passed by the truck again and went to look for the police.

Eugene Harper, a C.T.A. bus driver, stopped at the scene and saw Byrne staggering from the truck. Byrne was bleeding profusely and did not speak. Harper helped him to the back of the truck and went to seek police assistance. Neither Harper nor Caruso saw defendant or anyone other than Byrne in the vicinity of the truck.

Officer John Maier of the Chicago Police Department responded to a radio call concerning the truck and proceeded to 25th Street and Wentworth Avenue. He found Byrne lying in the back of the truck and radioed for an ambulance. Subsequently, Byrne was taken to Mercy Hospital where he was pronounced dead. At that time $480 was recovered from his trousers.

Curtis James testified that on February 24, 1973, at 8:15 p.m., he talked to defendant in the lobby of the building at 3653 South Federal. James

stated that Ralph Goolsby told him that he (defendant) had just made a "sting" and "cut up a man." James also testified that defendant told him the man was Byrne, the man he worked for, but that he didn't get any money. According to James, defendant told him he had gone to his mother's house to change clothes and that the police would be looking for him.

James further testified that three days later, on February 27, 1973, he was at his mother's house. Goolsby arrived and told James that he (Goolsby) had called the police and arranged to meet them at his own mother's house. Goolsby asked James to switch identities with him so that he (James) could talk to the police. James identified himself as Ralph Goolsby when the police arrived and left with them. James stated that he talked to the police for an hour and a half before he told them he was not Goolsby. When the police told him Goolsby was wanted for murder, he gave the police a statement concerning Goolsby's involvement.

On cross-examination, James testified that the "sting" took place at 29th and Dearborn and that Goolsby jumped off the truck at that point because the police were coming. James stated that Goolsby also told him he had thrown the knife on the railroad tracks.

Defendant testified and admitted he stabbed the deceased, but claimed he did it in self-defense. He stated that after making their last stop at 83rd Street and King Drive, he and Byrne proceeded north on the Dan Ryan Expressway toward 2930 South Dearborn. While they were still on the Dan Ryan between 39th and 35th Streets, they "got to combat," arguing, yelling and hollering at each other about the money which Byrne was to pay defendant as Byrne's helper. Later, on LaSalle Street between 29th and 31st Streets, Byrne stopped the truck to continue the argument. Defendant told Byrne he would return to the garage with him to submit their dispute to the division boss. Byrne said he wasn't going to give defendant the money and told defendant to get off the truck. Defendant refused and the two exchanged punches. Defendant testified that at this point Byrne picked up a lead paper weight, six inches in length and weighing five or six pounds, and "took a couple of swings" at him. Defendant testified he could not get the side door of the truck open and did not want to turn his back on Byrne. Defendant stated that after he had been hit several times with the weight, he picked up a knife which he used to open newspaper bundles. He testified he thought this action would frighten Byrne and give him (defendant) time to get out of the truck. Instead, Byrne grabbed defendant and the two of them wrestled. During the course of this struggle, Byrne was mortally wounded.

Defendant further stated that he remembered stabbing the deceased, but he could not recall how many times.

Dr. Pascual Culala, a coroner's pathologist, testified that there were six

stab wounds on the deceased's body. He characterized five of these as adynamic or nonfatal. Over defendant's objection, Dr. Culala characterized two lacerations on the deceased's left hand as "defense type wounds" and stated that the lethal wound pierced the deceased's right cheek, penetrated to the inside of the mouth downward and lacerated the left carotid artery. The result was a fatal loss of blood.

Defendant testified that when the deceased released him, defendant saw the blood and was frightened. He stated that he dropped his knife in the truck and ran to his mother's house at 2930 South Dearborn.

Officer John Maier testified that he found a knife on the right front step of the truck and, at trial, defendant identified it as his own.

At the pretrial hearing on the motion to suppress, Investigator John Kennedy of the Chicago Police Department testified that on February 27, 1973, he and another officer went to the apartment of Eroline Goolsby, defendant's mother, at 2930 South Dearborn, Chicago. They announced that they did not have a warrant to search her apartment; however, defendant's mother voluntarily admitted them. Investigator Kennedy stated that when he explained that they sought a torn jacket and a blood-stained pair of pants belonging to her son, Mrs. Goolsby led him to a dirty clothes closet and produced the garments. Mrs. Goolsby then signed a consent form for a search of her apartment, as did her daughter Annette, who lived in the apartment with her.

At that hearing, Annette Goolsby testified that her mother had been in mental hospitals three times; that she had been hospitalized two years earlier and was released in February 1972. Since that time she had been treated as an outpatient at a clinic, making visits there approximately three times a week.

Dr. Rafael Correira testified that he had examined Mrs. Goolsby at the Psychiatric Institute in December 1971. At that time he determined she suffered from schizophrenia and recommended immediate hospitalization. Mrs. Goolsby was then hospitalized for about two months. Upon her release from the hospital, she was diagnosed as having chronic schizophrenia.

Defendant argued at the pretrial hearing that his clothes should be suppressed because defendant's mother did not have the capacity knowingly and intelligently to consent to a search of her apartment. The trial judge denied the motion to suppress, finding specifically that defendant had sufficient standing to attack the search, if any; that there was no search since Mrs. Goolsby voluntarily retrieved the items sought to be suppressed; and that, assuming *arguendo* that there was a search, there was a knowing and intelligent consent to the search.

■■ On appeal, defendant contends there was a search and that there was no legally sufficient consent given to such seizure. We agree that there

was a search (*People v. Haskell* (1968), 41 Ill. 2d 25, 241 N.E.2d 430), but we find that the consent of defendant's mother was legally sufficient. There is no question but that defendant's mother actually consented to the search. The only issue is whether she was competent to consent. The trial court, after hearing testimony, determined that her consent was legally sufficient. In our opinion, evidence that defendant's mother had suffered from mental illness was insufficient to establish her incompetency to authorize the search of her own apartment. (*People v. Walker* (1966), 34 Ill. 2d 23, 213 N.E.2d 552.) The trial court's finding was not clearly unreasonable and we accept it. (*People v. Johnson* (1975), 32 Ill. App. 3d 36, 335 N.E.2d 144.) In addition, Annette Goolsby, defendant's 17-year-old sister, who lived with her mother, concurred with her mother's decision and signed a consent to search form presented by the police officers.

■■ In the case at bar, defendant gave his bloodstained clothing to his mother and asked her to clean it. We consider his entrustment of the clothing to her care significant. By sharing the apartment with his family, defendant assumed the risk that one of them would permit the common area to be searched. In *People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24, the Illinois Supreme Court, after quoting *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988, stated (58 Ill. 2d 83, 88-89, 317 N.E.2d 24, 17):

> "* * * If one has consented to the 'mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched,' these facts would indicate that the co-occupant has likewise surrendered his expectation of privacy in the property. * * * "

We find that defendant's constitutionally protected expectation of privacy was not violated. (*People v. Nunn* (1973), 55 Ill. 2d 344, 304 N.E.2d 81, *cert. denied*, 416 U.S. 904.) The trial court's denial of defendant's motion to suppress was proper.

■■ Further, the admission of this evidence did not substantially prejudice defendant's case. Defendant testified that he stabbed the deceased during their struggle. The articles of defendant's clothing were admitted to show that they were stained with blood of the same type as that of the deceased. While this evidence linked defendant with the stabbing, it did not bear upon the circumstances under which the fatal struggle occurred and its admission, unlike the evidence admitted in *Haskell*, was harmless beyond a reasonable doubt.

■■ Defendant's second contention is that the trial court should not

have allowed Dr. Culala, a forensic pathologist, to characterize two lacerations on decedent's left hand as "defense wounds." Defendant argues that this characterization invaded the province of the jury as to the ultimate issue of defendant's claim of self-defense. This contention is without merit because it is well established that medical testimony may be admitted in order to assist the trier of fact even though the expert opinion may coincide with an ultimate issue of fact. *People v. Carbona* (1975), 27 Ill. App. 3d 988, 1002, 327 N.E.2d 546, 560, *cert. denied* (1976), 424 U.S. 914.

■■ Defendant's third contention is that he was denied a fair and impartial trial by the prosecutor's improper cross-examination and closing argument. On cross-examination, the State elicited from defendant that he had seen Eugene Watts on the day of his arrest. After a series of questions concerning defendant's conversation with Watts, the following occurred:

"Q. Did you say anything about trying to get out of the state?
A. Nope.
Q. Where were you planning to go that day?"

Defense counsel's objection to this last question was sustained and the prosecutor never presented any evidence that defendant had discussed leaving the State with Watts. Defendant now claims that his credibility was improperly impeached since the implicit insinuation in the prosecutor's question was never supported by any evidence. While Illinois courts have consistently disapproved of the tactic of constructing a foundation for impeachment without supporting evidence (*People v. Sanders* (1934), 357 Ill. 610, 192 N.E. 697; *People v. Telio* (1971), 1 Ill. App. 3d 526, 275 N.E.2d 222; *People v. Snell* (1966), 74 Ill. App. 2d 12, 219 N.E.2d 554), in order to constitute reversible error the inference conveyed by the incomplete impeachment must be definitely prejudicial. (*People v. Williams* (1969), 105 Ill. App. 2d 25, 245 N.E.2d 17.) The improper insinuation here resulted from two questions. Objection was made only to the second; it was sustained. No other similar instances of this kind occurred and we find nothing in the record to indicate that the prosecutor acted in bad faith. Where this type of conduct has been held to constitute reversible error, the unfounded insinuations were substantial, repeated and definitely prejudicial. (*People v. Hawkins* (1975), 61 Ill. 2d 23, 329 N.E.2d 221; *People v. Nuccio* (1969), 43 Ill. 2d 375, 253 N.E.2d 353; *People v. Black* (1925), 317 Ill. 603, 148 N.E. 281.) In our opinion, the impact of this single incomplete attempt to impeach defendant's credibility was negligible and therefore not prejudicial.

■■ Defendant also argues that the prosecutor made improper inflammatory remarks in his closing argument which were unfounded in fact or law. Specifically, defendant contends that the prosecution told the

jury that defense counsel was trying to make a criminal out of Byrne and that a verdict of not guilty would label Byrne a criminal. Defendant's argument is unpersuasive. Defendant testified that Byrne assaulted him with a lead paper weight and that he acted in self-defense. The State sought to prove that defendant was the attacker. The jury thus had the burden of determining whether Byrne was murdered or had provoked the fatal struggle. The prosecutor's argument was simply directed to these conflicting aspects and was proper.

Defendant also argues that the prosecutor improperly interjected his personal opinion of defendant's guilt:

"* * * Could have all of that happened the way he told you in that small cab? I don't think so, * * *."

"* * * I don't think the guilt of Mr. Goolsby comes in this case, not only from Curtis James, * * *"

"No problem with Caruso's [a defense witness] testimony, I don't think. * * *"

"I will tell you what. This is a murder and nothing Mr. Goolsby lied about from that stand can change the facts of that charge, can change the evidence."

"* * * I think that shows the kind of guy we are dealing with. * * *"

"I will be frank with you. This to my mind, based on the evidence, is no classic robbery case. I have no doubt * * *"

"* * * I'll be damned if I'll call them superficial wounds. * * *"

"* * * What I am saying to you, I think this is what the evidence indicates, * * *."

While a prosecutor may not offer a purely personal opinion of the guilt of the accused, it is proper for him to argue or express his opinion that the accused is guilty where that opinion is based solely on the evidence. (*People v. Prim* (1972), 53 Ill. 2d 62, 77, 289 N.E.2d 601, 610, *cert. denied*, 412 U.S. 918; *People v. Jackson* (1966), 35 Ill. 2d 162, 220 N.E.2d 229, *cert. denied*, 393 U.S. 942; *People v. Williams* (1962), 26 Ill. 2d 190, 193, 186 N.E.2d 353, 356.) From our examination of the record, it is apparent that in each of the above instances the arguments made were founded on the evidence and were not expressions of purely personal opinions.

■■ Defendant also contends that the prosecutor improperly made personal attacks on defense counsel. After reviewing the record, we consider this argument unsupported. The remarks objected to were in answer to the final argument made by defense counsel. They did not accuse defense counsel of conspiring with defendant to contrive a defense (*People v. Farmer* (1963), 28 Ill. 2d 521, 192 N.E.2d 916; *People v. Freedman* (1954), 4 Ill. 2d 414, 123 N.E.2d 317) nor that defense counsel was attempting to free defendant by trickery (*People v. Gilyard* (1970),

124 Ill. App. 2d 95, 260 N.E.2d 364, *cert. denied*, 402 U.S. 911); nor did they concern matters not in evidence. On the record before us, we find that they were not prejudicial. *People v. Kostos* (1961), 21 Ill. 2d 496, 498, 173 N.E.2d 466, 468; *People v. Carr* (1969), 114 Ill. App. 2d 370, 252 N.E.2d 912.

Defendant further contends that the prosecutor improperly argued that the burden was upon defendant to prove his innocence. Defendant relies upon two statements:

"* * *The story that Mr. Goolsby told, and Mr. Menaker [defense counsel] hasn't even stood by, he says, we don't have to prove anything and we didn't prove anything to you, don't blame us, they have to prove it."

"* * * If you don't believe Goolsby's story, then it is not a manslaughter, it is murder."

From our review of the record, we find that these statements were in some respects inaccurate; but they did not infringe upon defendant's right to be presumed innocent. Accordingly, we reject the contention that they were prejudicial. Defendant's reliance upon *People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432, is misplaced.

■■ Finally, defendant contends that there was insufficient evidence to prove him guilty of murder beyond a reasonable doubt. We agree, but find that there was sufficient evidence to convict him of voluntary manslaughter. A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation. (Ill. Rev. Stat. 1971, ch. 38, par. 9—2.) The law in Illinois is well settled that mutual quarrel or combat is sufficient to support a finding of serious provocation. (*People v. Applewhite* (1975), 25 Ill. App. 3d 480, 323 N.E.2d 360 (abstract); *People v. Johnson* (1972), 4 Ill. App. 3d 249, 252, 280 N.E.2d 764, 766-67.) In *People v. Stepheny* (1966), 76 Ill. App. 2d 131, 221 N.E.2d 798, it was held that a quarrel over a dice game was sufficient provocation to warrant the reduced charge of voluntary manslaughter; and in *People v. Walker* (1965), 55 Ill. App. 2d 292, 204 N.E.2d 594, this court reduced a murder conviction to voluntary manslaughter even though it was clear that the killing was not done in self-defense (55 Ill. App. 2d 292, 302, 204 N.E.2d 594, 599).

It is our opinion that the evidence established that Byrne died as the result of a violent struggle with defendant over money. While we recognize that the credibility of witnesses is to be determined by the trier of fact, we conclude that the evidence as a whole is insufficient to prove defendant guilty of murder beyond a reasonable doubt.

■■ The evidence, however, is sufficient to prove defendant guilty of voluntary manslaughter beyond a reasonable doubt. Under the power

granted by Supreme Court Rule 615(b)(3), we reduce the degree of the offense for which defendant was convicted from murder to voluntary manslaughter. Ill. Rev. Stat. 1971, ch. 110A, par. 615(b)(3); *People v. Felton* (1973), 12 Ill. App. 3d 201, 298 N.E.2d 372 (abstract).

As thus modified the conviction is affirmed and the cause is remanded to the circuit court of Cook County with directions that a sentence be imposed for voluntary manslaughter appropriate to the facts and circumstances of this cause and to such matters in aggravation or mitigation as may be made available to the trial court. *People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764.

In light of our decision, we need not pass upon defendant's contention that the sentence imposed by the trial court was excessive.

Affirmed as modified and remanded with directions.

GOLDBERG, P. J., and SIMON, J., concur.