THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIE STOKES, Defendant-Appellant.

First District (2nd Division)    No. 78-443

Opinion filed May 1, 1979.

Rolland H. Stimson, Ltd., of Chicago (Rolland H. Stimson, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, James S. Veldman, and Kathleen M. McGury, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE HARTMAN delivered the opinion of the court:

Following a jury trial, defendant Willie Stokes was convicted of armed robbery and sentenced to be imprisoned for a minimum of four years and a maximum of four years and a day. In appealing that conviction, defendant urges several grounds for reversal, principal among which being that his guilt was not proved beyond a reasonable doubt and that certain identification testimony was improperly admitted at trial. For the reasons that follow, we affirm.

A motion to suppress identification of defendant gave rise to an evidentiary hearing prior to the trial and was denied. We shall consider the errors assigned with respect to that decision later in the opinion.

The trial proceeded upon the theory of accountability in that defendant took part in the common scheme or design of the armed robbery and shared in the proceeds of the crime. The chief prosecution witness was the victim, Eugene Dorsey. He testified that he was robbed at gunpoint by four men at about 3:30 a.m. on July 27, 1975, as he was about to enter a borrowed car, after leaving a tavern, the Golden Star Lounge, on Pulaski Road near Washington Boulevard in Chicago. Earlier he had been playing cards with friends and had consumed three or four beers. He drank one beer in the tavern before the incident. A man put a gun on his neck behind his ear and announced the stickup. At that time he saw three men, one of whom was defendant, for about one second, standing at the right side of the car near the front, their hands placed upon the

hood and top of the car. He saw their faces clearly because of the street lighting. The man holding the gun directed him to walk north to Washington and, as he did, the four men walked almost beside him and he could see them out of the corner of his eye. Thereafter, they walked behind him. He turned west on Washington as directed and when they arrived at a parking lot, they stopped.

Dorsey turned around and at this time saw all four men again, in light not as bright as it had been on the street, but he had no difficulty in seeing their facial features. He emptied his pockets as commanded and placed the contents on the ground. Defendant and the others picked up the car keys, Dorsey's wallet and the change he had put on the ground, located about two feet away from him. The gunman ordered the three men to "check out the ride," and all three left; the former remained for a period of time and also left. Upon Dorsey's return to the scene, the car was gone. He reported the robbery to the police and was thereafter driven home by them. Dorsey then contacted the owner of the car, his girlfriend, Caldonia Coleman, and together with two other persons, they drove around looking for the missing automobile. At about 7:30 a.m., Dorsey saw the car occupied by two people, blocking an alley behind 3808 West Wilcox Avenue, Chicago, near the Hamlin Avenue alley. His friend called the police while he waited nearby. Later, when he saw police bring a handcuffed man back toward the car, he approached and identified defendant as one of four men who had robbed him earlier that morning. The police told him nothing to cause his identification of defendant, nor did he regard as significant defendant's having then been in police custody. At trial, Dorsey was unable to describe the assailants' clothing at the time of the robbery, but he gave a physical description of defendant and one other man. He positively identified defendant in court as one of the four men who robbed him.

Caldonia Coleman testified that she owned the automobile in question and was with Dorsey when it was found in the alley. There had been two persons in the car when she first observed it. The police were then called, but before they arrived, she flagged down a passing patrol car, asked the officer driving it for assistance, and he accompanied her into the alley. A few minutes after the police arrived, they brought a person back to the car. She noted that the front end of the car was smashed into a garage door and the back end was up against a telephone pole, the battery was missing, the rear seat was displaced and the screws holding the radiator were loosened. Dorsey was not intoxicated when Ms. Coleman saw him after the car theft.

Police Officer John Satriano, driver of the patrol car flagged down by Caldonia Coleman, testified that he started driving down the alley where the car was located and when he came within fifty feet of the car, two

persons got out of it and ran eastward. He began chasing them on foot, but lost them. Two other police officers arrived, Sergeant Nielsen and Officer Carpola. Satriano told them he was pursuing a male Negro of medium height and stocky build, who was wearing a blue and white tank-top shirt and short blue pants. Satriano resumed his search and later saw defendant in the custody of Nielsen and Carpola in the alley, dressed in exactly the same clothing he first described to them. Satriano noticed no odor of alcohol about Dorsey that morning. He identified defendant in court as the suspect who was arrested.

Sergeant Peter Nielsen, one of the officers who had assisted Satriano, testified that after getting the description of the suspect, he and his partner Ronald Carpola proceeded down the alley and saw a man matching the description given them exiting a gangway at about 110 South Hamlin, start toward the mouth of the alley, change direction and start running southbound through the alley while looking behind him. Neilsen took him into custody. Dorsey approached them and spontaneously stated that the suspect was the person who had robbed him earlier. Nielsen identified defendant in court as the man apprehended that morning.

Defendant Willie Stokes testified that he was on the front porch of his home at 114 S. Hamlin Avenue, Chicago, during the preceding evening and early morning hours on the date in question. He left the porch only to get a six-pack of beer at sometime between 11:30 p.m. and 1:30 a.m., but returned to the porch where he stayed until about 6:30 a.m. Thereafter he cleaned the porch and when he took some garbage out to the alley at the rear and somewhat south of his home, he was arrested. He does not run because he suffers from asthma, and at the time of his arrest he was wearing a blue and white "T" shirt and "house shoes." As the police brought him into the alley, Dorsey was calling to them from Springfield Avenue. Stokes testified that the police asked Dorsey if defendant was "one of them," but he never answered; instead, Dorsey asked the woman who was with him the same question, and it was she who identified defendant.

Three alibi witnesses testified in defendant's behalf, Margie Taylor, Bertha Brown and Mrs. Josephine Stokes, defendant's mother, essentially agreeing that defendant spent the preceding night and the morning in question on the front porch of his residence. Taylor testified that defendant left the porch only for a short time around 11 p.m. to buy some beer. Brown testified that defendant never left the porch at all. Mrs. Stokes testified that defendant was on the front porch at all times, although she herself was not on the porch the entire time.

A close friend of defendant, James Bell, testified for defendant. He was at the Golden Star Lounge on the night in question, but Stokes was

not. Bell saw Dorsey there, drunk, observed him leave in that condition, saw him get into his car, start it up and run into the car in front of his in trying to get out of the parking place. He saw a man, known to him only as Danke, approach Dorsey and complain about his striking the car. Danke and another man had previously announced that they would try to get money from Dorsey by telling him that he damaged their car. A quarrel ensued and Dorsey left his keys in the car with the engine running, while going back into the tavern to call the police. Danke got into Dorsey's car and drove away. Later, at home, three or four houses south of where Stokes lived, Bell heard a crash at about 4 or 5 a.m., looked out to the alley and observed the same car jammed into the "T"-shaped Wilcox-Hamlin alley. He saw Danke get out of the car, then wearing a blue "T" shirt and short pants. Bell never brought this incident to the attention of the police. He has used two aliases on a number of occasions, admitted to having been a heroin addict, that he had needle marks on his arms, and had been convicted of felony for delivering a controlled substance.

The jury found defendant guilty of the charge of armed robbery, from which he appeals.

■■ Defendant asserts that the trial court erred in denying his motion to suppress Dorsey's in-court identification because his initial encounter with defendant allegedly occurred under circumstances where visual observation was difficult and brief; Dorsey's physical condition adversely affected his ability to observe and remember; and Dorsey's subsequent identification of defendant after the police investigation occurred under suggestive circumstances. Identification testimony must be excluded if there is a very substantial likelihood of misidentification. (*Neil v. Biggers* (1972), 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375.) Such likelihood dissipates here before evidence which shows that Dorsey had a clear chance to observe the faces of the men who robbed him at the scene of the first encounter, again peripherally as they walked toward the parking lot, and, finally in the parking lot itself under less favorable, yet sufficient, lighting conditions. The testimony of a single eyewitness is sufficient for purposes of identification where he has had such sufficient opportunity for observation. *People v. Tate* (1978), 64 Ill. App. 3d 1, 380 N.E.2d 976; *People v. Clarke* (1971), 50 Ill. 2d 104, 277 N.E.2d 866; *People v. Williams* (1966), 75 Ill. App. 2d 50, 221 N.E.2d 48.

■■ As to Dorsey's physical condition at the time of the robbery, the evidence was conflicting. Defendant's close friend testified that Dorsey was drunk prior to the robbery, in contrast to the testimony of Dorsey's girlfriend and one of the investigating police officers to the effect that he was not intoxicated and no alcohol was smelled about his person a relatively short time after the offense was committed. The determination

of this issue was for the jury. *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513; *People v. Tate* (1978), 64 Ill. App. 3d 1, 9.

Defendant relies upon *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, for the principle that an in-court identification is inadmissible where there is a danger that it resulted from a prior, unfair viewing of the defendant. In *Wade*, however, the unfair viewing took place in a post-indictment lineup during which the accused was not represented by counsel. Defendant's reliance on *People v. Lenair* (1970), 130 Ill. App. 2d 147, 264 N.E.2d 525, is also misplaced. The police there showed the witness photographs of the defendant and suggested to him before identification that the subject was the person who had robbed the witness. Notwithstanding that fact, the in-court identification in *Lenair* was held admissible because the witness had an independent basis for identifying the accused who had been clearly visible to him during the commission of the crime. Likewise, in *Neil v. Biggers*, in-court identification was permitted notwithstanding the witness' viewing of a police station lineup seven months after the crime because of the witness' opportunity to view the defendant during its commission.

Dorsey's viewing of defendant is also readily distinguishable from the circumstances characterized as unfair in *Wade, Lenair* and *Biggers*, in that the out-of-court identification here in question was not planned in advance. Rather, the confrontation between Dorsey and Stokes took place during the ongoing police investigation. The courts recognize in such situations the necessity for police to secure a prompt identification in order to determine whether to continue their search, or not. Such on-the-scene identifications are common, necessary, and not improper where, as here, the totality of the circumstances meet certain standards of reliability. (*People v. Manion* (1977), 67 Ill. 2d 564, 570-71.) Those standards were set forth in *People v. McKinley* (1977), 69 Ill. 2d 145, 152, 370 N.E.2d 1040, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1623, and include the " '* * * opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.' (*Manson v. Brathwaite* (1977), 432 U.S. 98, 114, * * *.)"

In *McKinley*, the witness viewed the accused in daylight from a distance of 20 feet "just for an instant" as the witness approached the house, and gave police a description of his clothing and his mustache. About one-half hour later, a police officer presented the suspect in handcuffs to the witness for identification. Although McKinley was clean shaven, the witness positively identified him and, even though the

witnesses disagreed with respect to the accused's clothing at the time of identification, the court held there that evidence resulting from this identification was admissible. In the present case, Dorsey was considerably closer to Stokes when he first saw him than was the case in *McKinley*. As in *McKinley*, the initial viewing here was extremely brief; however, unlike *McKinley*, the witness in the instant case had further opportunities to view the suspect, to which we have previously alluded. Dorsey's attentiveness was not probed at trial, but the circumstances of the robbery, at the point of a gun, were such that he would have been at least as observant as the witness in *McKinley*, who, at the time of his viewing, was not yet aware that a crime had been committed. As to the degree of certainty manifested, Dorsey, on his own volition, positively identified defendant in the alley, according to the testimony of both Dorsey and the police. Only defendant's testimony is to the contrary. Finally, the viewing in the present case occurred within a few hours of the crime so that Dorsey's memory of what he had seen was still relatively fresh. Accordingly, the evidence is well within the standards enunciated in *McKinley* and *Manson*.

■ Defendant further contends that the evidence was inadequate to demonstrate defendant's guilt by accountability. Conviction upon accountability principles requires proof of soliciting, aiding, abetting, agreeing or attempting to aid another person in the planning or commission of a crime, which conduct occurs prior to or contemporaneous with the offense, accompanied by concurrent, specific intent to promote or facilitate the commission of that crime. (*People v. Owens* (1975), 32 Ill. App. 3d 893, 895, 337 N.E.2d 60.) Mere presence at the scene of a crime or negative acquiescence in its commission is insufficient to establish guilt by accountability. (*People v. Gilmore* (1974), 18 Ill. App. 3d 846, 310 N.E.2d 712 (abstract); *In re Tucker* (1974), 20 Ill. App. 3d 377, 381, 314 N.E.2d 276.) Even presence, running away and matching a general description of an active participant may not be sufficient to establish guilt when the general description relies upon common items of apparel and the suspect can explain his presence at the scene. *In re Woods* (1974), 20 Ill. App. 3d 641, 314 N.E.2d 606.

Defendant's argument ignores important aspects of the evidence adduced in the instant case, making the above cited authorities on which defendant relies factually inapposite. Defendant's conduct cannot be considered mere presence or negative acquiescence, as in *Gilmore*, wherein the defendant merely stood to the side while the crime was being committed; nor was Stokes walking away from the scene of the crime as it was taking place, which were the facts in *Tucker*; nor was he a nonparticipating passenger in an auto being driven away from the scene of the offense as in *Owens*.

Furthermore, defendant's arrest near the location where the stolen car was found was not based simply upon his presence at that location, but also upon his matching the description of a person who had been seen first inside the car and later fleeing as a policeman approached. Defendant's identification was based in part upon a general description of clothing not unusual for a youth to wear in that neighborhood at that time; however, the eyewitness victim at the scene spontaneously and unhesitatingly identified defendant as one of the men who had robbed him, unlike the circumstances in *Wood*, in which the defendant there was identified by the victim as one "who could have" robbed her, so stated as she shook her head in a negative movement at the time of identification. Defendant's conduct at the robbery scene and his presence later in and nearby the stolen auto adequately supports the jury's determination that he actively participated with an intent to facilitate the commission of the crime.

■ Defendant insists that conflicting testimony presented by the prosecution demonstrates the State's failure of proof. Resolving conflicting testimony is a function peculiarly within the province of the jury, however, and its determination of guilt will not be disturbed unless the evidence is so improbable as to raise a reasonable doubt of guilt. (*People v. Manion; People v. Tate.*) We find nothing inherently improbable in the State's evidence requiring reversal on this point.

Defendant next claims that the prosecution failed to inform him before trial of the missing battery and radiator, although numerous discovery requests had been made. The matter of the battery and radiator first came to his attention, he says, when they were mentioned in the State's opening argument. Defendant invokes Supreme Court Rule 412(f) (Ill. Rev. Stat. 1975, ch. 110A, par. 412(f)) and contends that he was not adequately informed of the charges against him because the indictment in the present case did not mention theft of the car's battery and radiator and he was in no other way informed that he was so accused. The record shows that defendant was not charged with such an offense, however. The absence of the battery and the loosening of radiator screws were mentioned by the prosecution for the purpose of suggesting to the jury a motive for the theft of the automobile and a reason for having placed the car near defendant's residence. The indictment particularized the precise offense charged in keeping with the requirements of *People v. Harvey* (1973), 53 Ill. 2d 585, 294 N.E.2d 269. We find no error in this aspect of the case.

Defendant maintains that he was denied a speedy trial because, although a written demand for immediate trial was filed on March 14, 1977, the prosecution was granted a continuance on August 18, 1977, to a date beyond the statutory term (Ill. Rev. Stat. 1977, ch. 38, par. 103—5). Defendant states that this continuance was improper because section

103—5(c) requires that such continuances be granted only if the prosecution demonstrates due diligence throughout the term, a qualification absent in the present case. Defendant was not in custody during this period of time. The State filed a petition for an extension of time under the Fourth Term Act on August 18, 1977, asserting that since March 14, 1977, the prosecution was unable to locate Dorsey or Caldonia Coleman. After the latter's name, a written notation "in hospital" appears. No transcript of the August 18 hearing has been included in the record; however, the defense motion for dismissal for lack of a speedy trial, made before the trial commenced, also shows that the August 18 continuance was based upon the hospitalization of a witness, albeit one who defendant did not deem material. There is thus no factual basis in the record upon which to conclude that the August 18 continuance was an abuse of the court's discretion. See, *e.g., People v. Gamble* (1976), 41 Ill. App. 3d 394, 353 N.E.2d 136.

■ Several remaining arguments raised by defendant relate to alleged errors which we find insubstantial. One of these involved a comment by the trial judge to a juror in answer to her question as to what weight she must give to the opinion of another juror, to which defendant states he responded that she could decide the case "in any way she wanted." It is clear, however, that the jury was properly instructed that they were required to base their verdict only upon the evidence presented in the case. Any misunderstanding which might have ensued from the judge's comment was thereby ameliorated.

■ Defendant complains of prejudicial admission into evidence of hearsay testimony relating to remarks made by the gunman to Dorsey during the armed robbery. Verbal expressions accompanying the commission of an offense, such as those made in the instant case, are admissible in evidence as exceptions to the hearsay rule. See, *e.g., People v. Simpson* (1976), 39 Ill. App. 3d 318, 321, 349 N.E.2d 441.

Defendant also urges prejudicial error with regard to comments made by the prosecutor in closing argument. We have examined these remarks carefully in context with the entire closing argument. It is apparent that they were based upon the evidence and reasonable inferences which could be drawn therefrom, rather than constituting expressions of the prosecutor's purely personal opinions. *People v. Goolsby* (1977), 45 Ill. App. 3d 441, 448, 359 N.E.2d 871; *People v. Poole* (1970), 121 Ill. App. 2d 233, 257 N.E.2d 583.

For the foregoing reasons there are no grounds upon which to base a reversal of defendant's conviction by the jury. We accordingly affirm.

Affirmed.

STAMOS, P. J., and PERLIN, J., concur.