2021 IL App (1st) 170323-U

No. 1-17-0323

Order filed August 5, 2021

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| vs. | ) ) | No. 12 CR 13266 |
| JOEY LACYNIAK, | ) ) | Honorable Erica Reddick |
| Defendant-Appellant. | ) | Judge Presiding |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) Evidence was sufficient for the jury to find the defendant's killing of the victim was not justified as self-defense; (2) The jury could reasonably find defendant did not prove the killing was mitigated by an unreasonable belief in self-defense or serious provocation from mutual combat; (3) The defendant's actions were not merely reckless so as to reduce the conviction to involuntary manslaughter; and (4) The trial court did not err by giving jury instructions regarding an initial aggressor's use of force.

¶ 2        Joseph Lacyniak[1] appeals his conviction for first degree murder following a jury trial in which he testified claiming he stabbed the decedent John Hughes in self-defense. On appeal, Lacyniak asserts several alternative arguments. First, he claims the State failed to prove the killing was not justified under self-defense. Second, if not justified, the conviction should be reduced to second degree murder as he proved the mitigating circumstances of either an unreasonable belief in self-defense or a sudden and intense provocation due to mutual combat. Third, the conviction should be reduced to involuntary manslaughter because the stabbing was reckless, not intentional. Last, Lacyniak argues the trial court erred by giving two jury instructions, over defense objections, regarding an initial aggressor's use of force that were not supported by the evidence.[2] For the following reasons, we affirm.

¶ 3                                                    I. FACTS

¶ 4        Joseph Lacyniak fatally stabbed John Hughes during a fight outside of Rocky's, a bar at 31st and Wells Streets in the Bridgeport neighborhood of Chicago, in the early morning hours of June 18, 2012. Most of the fight was captured by a surveillance camera outside the bar, but the men are obscured at times by a date and time stamp in the upper right corner of the video.

¶ 5        Earlier that night, Lacyniak, known as JoJo, went to the apartment of his neighbors Anthony Carter and Erica Lopez. Anthony and Erica had family and friends over after a barbeque to celebrate Father's Day. Among their visitors were John Hughes, Anthony's cousin, and Roxanne Simenthal, Erica's mother.[3] John and Roxanne had a three-year "on and off" romantic relationship.

---

[1]The record indicates that the defendant's actual name is Joseph Lacyniak. He was indicted under the name Joey Lacyniak. Neither the indictment nor case caption were ever amended.

[2]In his initial brief, Lacyniak argued the court failed to rule on his posttrial *pro se* allegations of ineffective assistance and, thus, remand was required under *People v. Krankel* for further proceeding to consider those claims. In his reply brief, Lacyniak acknowledged the report of proceedings refuted this argument and withdrew the issue.

[3]Roxanne testified her last name was Homer at the time of the 2016 trial.

At some point in the previous year, John moved to Texas for a job working on tugboats. On this occasion, he was back in Chicago visiting family and Roxanne. Previously, Roxanne had lived with John in Texas for a few months but returned to Chicago because she was unable to find employment.

¶ 6    Accounts conflicted, but several witnesses testified there was an incident in the kitchen. Anthony testified John and Lacyniak "had words" and, although he did not recall what was said, Roxanne was the subject. According to Anthony, Lacyniak waved a gun at John and said, "I don't even need this for you," but he never heard John threaten Lacyniak. Anthony testified that he asked Lacyniak to leave because of the incident. Erica similarly testified that Lacyniak and John were "talking crap to each other" and Lacyniak waved a gun telling John, "I don't need to use this on you."[4] Erica also testified that Anthony asked Lacyniak to leave. Nicole Ledcke, a relative of Anthony and John who was in the adjacent living room, testified she observed Lacyniak yell at John face-to-face in the kitchen before Anthony got between them and asked Lacyniak to leave.

¶ 7    According to Roxanne, who was called by the defense, Lacyniak spilled a beer on the kitchen table, which she began to wipe up. She testified John became very angry in response. Roxanne admitted she and Lacyniak "had a moment" in which they twice had sex after she returned from Texas. She was "off" with John at the time. Lacyniak also admitted to a brief romantic relationship with Roxanne. Likewise, he testified that he spilled a beer in the kitchen and John "went through the ceiling" when Roxanne began to clean it up. Lacyniak denied that he waved a gun at John, threatened him, or argued with him. Instead, he said John was arguing with Roxanne and followed her out of the kitchen. Roxanne said she never observed a gun, but admitted she left the kitchen

---

[4]Defense questioning on cross-examination of both Erica and Anthony implied recent fabrication that Lacyniak displayed a gun in the kitchen. As a result, the State elicited on redirect examination that both Erica and Anthony stated Lacyniak displayed a gun in video recorded interviews the day after the stabbing and testified to the same before the grand jury.

while the others remained for some time. Lacyniak also denied that Anthony asked him to leave. Roxanne testified on direct that Anthony did not ask Lacyniak to leave, but on cross-examination said Anthony might have done so. In her grand jury testimony, Roxanne testified Lacyniak was asked to leave.

¶ 8    After Lacyniak left, John continued to argue with Roxanne. In Roxanne's description, John "threw a tantrum" and was "being mean" to her. Erica similarly testified John was agitated and followed Roxanne from room to room in the apartment trying to argue with her. Roxanne testified John told her he was going to "beat [Lacyniak's] ass," but she did not specify when he said this or if anyone else was present to hear. In her grand jury testimony, she denied that John ever threatened Lacyniak. In any event, Roxanne was upset with John for how he was acting and wanted to get away from him. She and Erica left the apartment to purchase beer.

¶ 9    On her way out, Roxanne spoke with Lacyniak by phone—Lacyniak testified she called him and Roxanne testified Lacyniak called her—and he invited her and Erica to join him at Rocky's, the corner bar two doors down from the apartment building. Roxanne and Erica went to Rocky's and took spots at the bar next to Lacyniak. A few minutes later, John entered Rocky's and went to the other end of the bar. Lacyniak beckoned John over and invited him to join them. John joined and, according to Erica, John and Lacyniak argued about Roxanne. This upset Roxanne and she wanted to leave. Roxanne tapped John on the back and said, "let's go." Roxanne and Erica walked out of Rocky's, but John remained at the bar beside Lacyniak. Two minutes later, Erica returned and patted John on the back imploring him to leave. John seemed to ignore her, and Erica walked out again. Surveillance video from inside Rocky's shows John and Lacyniak in apparent conversation beside each other at the bar. At one point, John and Lacyniak shook hands. Later, Lacyniak patted John on the back and started to walk away. John grabbed Lacyniak's hand and

pulled him back. The two hugged and resumed talking. According to Lacyniak, they were not arguing; rather John was repeatedly "pleading his case" about Roxanne. The video shows Lacyniak raising his hands at one point. Lacyniak said he was telling John "you win" because John kept repeating himself. Erica returned a second time and again tried to get John to leave, but to no avail. Erica sat at a table for a few minutes then tried a third time to get John to leave, again without success. Erica finally gave up and went home.

¶ 10     According to the video, most patrons left Rocky's by 1:30 a.m. and the lights came on at 1:32 a.m. Still inside, Lacyniak and John moved from being shoulder to shoulder at the bar to facing each other. John then walked out of Rocky's by himself. Less than 15 minutes elapsed from the time John first entered until the time he leaves.

¶ 11     The exterior video shows John walk down 31st Street alone after exiting Rocky's. The record does not reveal where he went or what he did. For two minutes after John left, Lacyniak talked to his friend, Russell, who he had been sitting beside. Lacyniak and Russell walked out together and continued their conversation on the sidewalk just outside the door to Rocky's for a few minutes. They then walked out of view. Lacyniak testified Russell wanted to show Lacyniak something in his new car parked on the street in front of Rocky's, so they walked into the street by the driver's side door.

¶ 12     A minute later, John comes back into view from the direction from which he walked about five minutes earlier. John walked into the street toward the driver's side of Russell's car and then out of view. About 30 seconds later, John and Lacyniak walked back into view side by side and onto the sidewalk in front of Rocky's. John walked slowly with his back to Lacyniak as Lacyniak followed and gesticulated while he spoke. The video's time stamp obscures their upper bodies at this point. But their lower bodies, especially their feet, indicate John stopped and faced Lacyniak.

A few seconds later, Lacyniak kicked off his sandals. John turned and took a few steps away. Moments later, John abruptly backpedals toward the wall of Rocky's. The fight had begun.

¶ 13 According to Lacyniak, before the fight started, John told him he would "kill any motherfucker who messes with Roxie."[5] Lacyniak took it as a threat and replied, "what the fuck did you say?" Lacyniak testified he then kicked his sandals off "because sandals are hard to fight in." But then John's demeanor changed after Lacyniak said he did not "want his lady." Lacyniak thought John was no longer threatening him so he stepped back into his sandals. However, Lacyniak testified, John then told him to go put shoes on and they would fight in the alley. Lacyniak again responded, "what the fuck did you just say?" Lacyniak testified John then punched him in the left cheek with his right fist. Lacyniak claimed the punch knocked a filling loose and cut the inside of his mouth. According to Lacyniak, he took a step back and responded by punching John four or five times, forcing John against the wall.

¶ 14 Then, in Lacyniak's account, John was "dazed," holding his left hand up, and leaning against the wall. The next moment, Lacyniak noticed John was "fumbling" with a knife in his right hand which John had taken out of his pocket and was trying to open, but the blade was "on an angle" or "like a hook." Lacyniak claimed he reached in and twisted the knife from John's hand. Lacyniak said he then backed up while John was "recovering" against the wall and waited to see what John would do, but he did not want to fight John. John came off the wall and they began to circle like boxers. John swung at Lacyniak, but Lacyniak blocked the punch with his left arm. Lacyniak testified he cut John on the forearm with an overhead punch-like motion when John tried to grab

___

[5]Initially, Lacyniak simply testified that John had threatened him. The trial court excluded testimony of the statements as hearsay. Upon motion of defense counsel, the court properly allowed the defense to reopen direct testimony and elicit the specific statements. Statements offered to show their effect on the listener or to explain the listener's subsequent course of conduct are not hearsay. *People v. Sangster*, 2014 IL App (1st) 113457, ¶ 76.

him, but Lacyniak stated he never felt "pressure" on the blade. Apart from slicing John's forearm, Lacyniak could not remember when he first stabbed John because he was "reacting and not thinking." John continued to advance toward Lacyniak and throw punches. At some point, John hit him so hard that Lacyniak was "see[ing] stars" and was forced into the street from the sidewalk. Later, both ended up in the street as John tried to grab Lacyniak by the collar with his left hand. Lacyniak waved the knife to keep John off.

¶ 15    Erica, who was back in her third-floor apartment heard noise from outside below. She looked down and saw John and Lacyniak fighting. Erica yelled to Anthony who rushed downstairs and outside. Erica followed. Anthony pulled John back from Lacyniak and got in between them. Both John and Lacyniak stopped fighting and backed away from each other. Lacyniak leaned back against the front of a parked vehicle to catch his breath as Anthony bent over and picked something up from the street. Anthony testified it was John's black hat, which the video shows John wearing before the fight. Lacyniak said it was the knife, which he had dropped after Anthony pulled John away, and claimed that Anthony put it in his pocket after picking it up. Lacyniak also testified Anthony yelled toward him, "Are you going to fight or are you going to stab!" Anthony walked with John over to the steps of the nearest building. John lifted his shirt showing that he was bleeding from the chest. Anthony testified John said, "he fucking stabbed me!" Lacyniak testified he did not realize John had been stabbed until then. Lacyniak said he never felt the knife hit anything; rather, "it felt like air."

¶ 16    Both Anthony and Erica, who arrived right after Anthony, testified Lacyniak said, "He sucker punched me!" Erica added that Lacyniak said, "I don't know what happened." According to Nicole, who was watching from the apartment, Lacyniak exclaimed, "Yeah, what now, n***," toward John after Anthony separated them. Anthony and Erica testified Lacyniak said nothing

about John pulling the knife. Erica testified Lacyniak said he was "going to get a strap[6] and take care of this." Erica also testified she observed Lacyniak "put something on the side of his waist."

¶ 17     Lacyniak acknowledged he did not tell them John produced the knife but said he did not have the chance to because Erica was hitting him and yelling. Anthony, Erica, and Nicole testified Lacyniak only stayed for a short time and watched from the nearby alley while they attended to John and waited for paramedics. Lacyniak claimed he left when he saw an ambulance approaching and did not stay because he was afraid Anthony or John might try to attack him or cause damage to the apartment building owned by his girlfriend's family. Lacyniak surrendered himself to Chicago police at approximately 7 p.m. the same day, June 18, 2012. He explained he did not go to the police station until evening because he was waiting for his lawyer who was tied up in federal court.

¶ 18     According to the medical examiner and autopsy photos, John sustained two stab wounds to the upper chest on his left side. One wound was 2 ½ inches deep and punctured the sac surrounding the heart. The other was 3 ½ inches deep and punctured the heart itself. John also sustained several incise wounds to his forearms and across his outer right hand just above the knuckles. The medical examiner determined John died from multiple stab wounds and the manner of death was homicide. His blood alcohol level was .208.

¶ 19     After closing arguments, the trial court gave the jury instructions on self-defense, second degree murder based on an unreasonable belief in self-defense, second degree murder based on serious provocation resulting from mutual combat, and involuntary manslaughter. Over defense objections, the court gave instructions regarding use of force by an initial aggressor. The jury received a verdict form for not guilty along with corresponding forms for guilty verdicts for first

---

[6]In a sidebar discussion, the State proffered that Erica would testify she understood "strap" to mean a gun. The trial court sustained the defense's objection and excluded that testimony.

degree murder, second degree murder, and involuntary manslaughter. The jury found Lacyniak guilty of first degree murder. Due to a prior conviction for first degree murder, the court sentenced Lacyniak to a mandatory term of natural life imprisonment. This appeal followed.[7]

¶ 20                                    II. ANALYSIS

¶ 21                                    A. Self-defense

¶ 22        On appeal, Lacyniak argues we should reverse his conviction because the State failed to prove beyond a reasonable doubt that he did not act in self-defense. When a defendant challenges the sufficiency of the evidence on appeal, the reviewing court does not retry the defendant. *People v. Eubanks*, 2019 IL 123525, ¶ 95. Instead, we consider whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* A trier of fact may draw reasonable inferences that flow from the evidence before it and we must allow all reasonable inferences from the record in favor of the prosecution. *Id.* The trier of fact assesses the credibility of witnesses, determines the appropriate weight of the testimony, and resolves all conflicts or inconsistencies in the evidence. *People v. Ware*, 2019 IL App (1st) 160989, ¶ 45. We will not substitute our judgment for that of the jury and will not set aside a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *Id.*

¶ 23        For a defendant to establish that his use of force was justified as self-defense, a defendant must demonstrate that (1) unlawful force was threatened against him, (2) defendant was not the initial aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) defendant subjectively believed a danger existed that required the use of force, and (6) defendant's

---

[7]Lacyniak filed a timely notice of appeal following entry of the sentencing order. Accordingly, we have jurisdiction to hear his appeal pursuant to Article VI, Section 6 of the Illinois Constitution of 1970 and Supreme Court Rules 603 and 606.

beliefs were objectively reasonable. *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). "The use of deadly force is limited to those situations in which the threatened force will cause death or great bodily harm or the force threatened is a forcible felony." *People v. Rodriguez*, 258 Ill. App. 3d 579, 583 (1994); 720 ILCS 5/7-1(a) (West 2012). Once a defendant raises the affirmative defense of self-defense, "the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Lee*, 213 Ill. 2d 218, 224 (2004). If the State negates any one of the elements of defendant's claim, defendant's claim must fail. *Id.* at 225.

¶ 24     Lacyniak argues that the State failed to disprove his claim of self-defense as the evidence showed John was the aggressor. Specifically, Lacyniak contends the evidence corroborated his testimony that John confronted him outside of Rocky's, sucker-punched him, and produced the knife.

¶ 25     To be sure, some uncontroverted evidence showed that John's actions had a role in precipitating the fight. Though accounts differed, all witnesses agreed John became angry in the apartment about Roxanne and Lacyniak. John persisted in following and arguing with Roxanne. Later at Rocky's—whether he was arguing, as Erica testified, or "pleading his case," as Lacyniak said—John remained agitated. He refused to leave the bar despite Roxanne asking him and multiple pleas to do so from Erica as well. Most significant, John returned and approached Lacyniak on the street outside of Rocky's after leaving and walking away minutes earlier. Whatever was said, Lacyniak kicked off his sandals and was prepared to fight. Seconds later, they were fighting. During the fight, John threw several punches and forced Lacyniak backward into the street. He grabbed Lacyniak's collar and continued to strike at him even as Anthony pulled

him away. Yet despite the evidence of John's aggression, the trial record reveals substantial conflicts in the matters Lacyniak relies on to assert he proved that he was not the initial aggressor.

¶ 26     First, the parties disputed whether Lacyniak displayed a gun toward John in the kitchen. Erica and Anthony gave testimony, consistent with each other and with their prior statements, that he did. Only Roxanne testified consistent with Lacyniak's denial. But Roxanne admitted she was not present for the entire encounter, and she was impeached on other points in which her trial testimony was more favorable to Lacyniak than her prior inconsistent statements. Thus, the jury may not have found Roxanne credible. See *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85 ("The trier of fact may accept or reject all or part of a witness's testimony"). In addition, if the jury found Erica's testimony credible, they could have taken Lacyniak's later statement that he was going to get a "strap" as corroborating that he had a gun earlier in the apartment. Although the trial court precluded the State from eliciting that "strap" meant gun, jurors could have been aware of that meaning or inferred it from context. However, whether Lacyniak displayed the gun in the apartment is not dispositive of initial aggression in this case since the stabbing occurred hours later and there appeared to be a "cooling off" period. Nevertheless, if the jury believed that Lacyniak did display the gun, it could be taken as indicia of his aggression toward John.

¶ 27     Similarly, the jury may not have found Lacyniak's claim that John sucker-punched him credible. Contrary to Lacyniak's assertion, the video outside of Rocky's does not corroborate that account. While the date and time stamp obscures John and Lacyniak's upper bodies, their lower bodies, especially their feet, are visible at the outset of the fight. Lacyniak testified that just after he stepped back into his sandals, John punched him in the left cheek with his right hand so hard that it dislodged a tooth filling. The position and movement of their legs and feet contradict that account. Instead, Lacyniak quickly steps toward John, who had just turned away and taken a couple

steps down the sidewalk. The next moment, John abruptly backpedals toward the wall of the building as though he had been hit or pushed. In addition, evidence contradicted that Lacyniak had been punched in the cheek as he claimed. Sergeant Michael Kelly, who observed Lacyniak at the police station when Lacyniak was arrested approximately 18 hours after the fight, testified Lacyniak did not display any discernable injuries or complain of any pain. Likewise, photos of Lacyniak taken at that time do not depict any discernable injuries consistent with being punched in the cheek as he described. Ultimately, Lacyniak's claim that John punched him first was wholly dependent on Lacyniak's testimony. But the jury simply may not have believed him. See *People v. Perez*, 100 Ill. App. 3d 901, 905 (1981) ("A jury is not required to accept as true the defendant's testimony concerning self-defense").

¶ 28       Next, and perhaps most significant, the evidence did not corroborate Lacyniak's claim that John produced the knife. As with the alleged sucker punch, the video does not show the production of the knife and the men are obscured when Lacyniak testified this occurred. Thus, Lacyniak's testimony was the sole evidence that John produced the knife. Beyond the lack of corroboration, some evidence tends to refute Lacyniak's claim and imply the opposite—that he produced the knife himself, not John. Lacyniak testified that John was "dazed" and leaning against the wall while fumbling with the knife before he reached in and twisted it out of John's hand. But the video shows John against the wall for a fraction of a second before he quickly moved away. Lacyniak claimed that John reached into his pocket, pulled out the knife, started to open it, and Lacyniak twisted it away—all while John was against the wall. The jury may have found it implausible that all those things could have occurred in the very brief time the video shows John against the wall. Further, when Anthony and Erica arrived and found John stabbed and bleeding, Lacyniak had the presence of mind to offer them an explanation; that John sucker-punched him—not that John

produced a knife. Yet if John had produced the knife, a rational fact finder could have expected Lacyniak to have said so at that time. And since he did not say so, the jury could infer that Lacyniak produced the knife, not John. See *People v. Bradford*, 2016 IL 118674, ¶ 12 ("It is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts"). Additionally, Erica testified Lacyniak "put something on the side of his waist" and Anthony testified he picked up John's hat from the street, not the knife as Lacyniak claimed. That testimony could also support an inference that Lacyniak kept the knife because it was his and he produced it.

¶ 29   So, contrary to Lacyniak's contentions, the trial evidence conflicted on factual issues that the jury could have resolved against him. Moreover, viewing the evidence in the light most favorable to the State as we must, a rational jury could find that Lacyniak did not act in self-defense even if it did accept some aspects of his version. For instance, even if the jury believed that John produced the knife, they could have found Lacyniak was not justified in using it after taking it from John. The use of deadly force is not justified where the victim, even though initially the aggressor, has been disarmed. *People v. Lee*, 243 Ill. App. 3d 1038, 1043 (1993).

¶ 30   Likewise, irrespective of who punched who first, the video clearly shows Lacyniak to be a willing combatant. "One who acts in self-defense is not entering into combat of his own free will * * *." *People v. Sutton*, 353 Ill. App. 3d 487, 495 (2004). Conversely, one entering combat of his own free will does not act in self-defense. *People v. White*, 293 Ill. App. 3d 335, 338 (1997); *People v. Grayson*, 321 Ill. App. 3d 397, 403 (2001). By his own testimony, Lacyniak's response to John's alleged threat was "what the f*** did you say," which a jury could construe as a reciprocal threat. Lacyniak testified and the video shows that he kicked off his sandals to prepare to fight in response to John's alleged "challenge." Having the opportunity to observe Lacyniak's

demeanor while testifying along with the video of his actions, the jury could have concluded he was willing to fight and not in fear for his life as he claimed. See *People v. Leger*, 149 Ill. 2d 355, 390 (1992) (The jury's ability to observe the demeanor of witnesses while testifying gives it a superior vantage point for judging credibility). "The self-defense concept is to protect person, not pride." *People v. Woods*, 81 Ill. 2d 537, 543 (1980). Here, the jury could have found Lacyniak was more motivated by his interest in the latter.

¶ 31        Furthermore, the jury could have rejected Lacyniak's self-defense claim upon finding his use of force excessive. At the outset, the altercation was a fist fight between two men of comparable age, build, and size. Lacyniak never attempted to withdraw or make a truce. Nor did he restrict himself to using his fists. Rather, the video shows that as the fight progressed, Lacyniak repeatedly advanced toward John and thrust the knife at him whenever he could. At one point, John forced Lacyniak into the street from the sidewalk. John remained on the sidewalk greater than arm's length away from Lacyniak. Despite the appreciable distance and that Lacyniak was armed while John was not, Lacyniak stepped back onto the sidewalk toward John. He then feinted an attack—a deceptive movement intended to draw a reaction so the attacker gains a positional advantage. Indeed, the feint enabled Lacyniak to move in close and stab John in the side of the chest with a vicious side uppercut motion. Blood is visible on John's shirt afterward. Lacyniak continues to thrust the knife with side-armed blows under John's left arm. Just before Anthony arrived, John appeared to grab Lacyniak's collar with his left arm. That position left John's upper torso exposed and within reach for Lacyniak's right, knife-wielding hand. Lacyniak then stabbed John in the side of the chest again with a side motion before switching to downward swipes at John's arms. Lacyniak's testimony only accounted for those last, more defensive motions. He offered no explanation for the stabbings of John's chest. While Lacyniak claimed he did not know

he had stabbed John, the video evinces his very deliberate effort to do so. Also, Lacyniak testified that the knife was "on an angle" or made a "hook" when it was in John's hand. If Lacyniak took the knife from John, then he must have opened it himself because the blade is straight in the video. So even if the jury accepted that he took the knife from John, Lacyniak's own account shows he took a step to escalate the deadliness of the altercation. With Lacyniak's evident willingness to fight and his offensive actions while he was armed and John was not, the jury could find Lacyniak's use of force was retaliatory and excessive even if they believed John had hit him first or produced the knife as he testified. "[I]f the defendant responds to a confrontation with such excessive force that he is no longer acting in self-defense but in retaliation, the excessive use of force renders the defendant the aggressor, even if the other person involved actually commenced the confrontation." *People v. Guja*, 2016 IL App (1st) 140046, ¶ 52.

¶ 32    We note that "the law does not require that the aggressor be armed in order that the use of a deadly weapon to stop the attack be justified as self-defense. Where it is clear that the aggressor is capable of inflicting serious bodily harm on the defendant without the use of a deadly weapon, and it appears that he intends to do so, then it is not necessary that the aggressor be armed for the defendant to employ deadly force in self-defense." *People v. Evans*, 259 Ill. App. 3d 195, 209 (1994). However, the jury's verdict indicates it did not believe the evidence showed this case to be a clear instance of justified use of a deadly weapon against an unarmed aggressor. Nor do we.

¶ 33    Lacyniak argues his case resembles *People v. White*, 87 Ill. App. 3d 321 (1980), in which the appellate court reversed a conviction for voluntary manslaughter finding the defendant had proven he shot the decedent Glisper Brown in self-defense. Like John in this case, Brown had a grievance with White at one point in the evening and later went to find him, continuing to press the matter. White accidentally discharged a gun at a tavern causing tile fragments to hit Brown's

leg, to which Brown, who had longstanding animosity with White, responded angrily. *Id.* at 322. Hours later, Brown went to White's apartment building and, by White's partially corroborated account, brandished a knife and threatened his life. *Id.* at 323. The appellate court found the State had not proven beyond a reasonable doubt that White did not reasonably believe he was in danger of death or great bodily harm under the circumstances. *Id.* at 324. Those circumstances, however, included that Brown had previously cut White with a knife in a different dispute. *Id.* The court also observed that the shooting occurred during quickly unfolding events and White should not be expected to use inerrable judgment in the space of a few seconds when he had reasonable grounds to believe he was in danger of life or great bodily injury. *Id.* at 323.

¶ 34     We find *White* distinguishable from this case. There was no evidence that John had ever carried out a threat, harmed, or even had a history of animosity with Lacyniak before this incident. To the contrary, Lacyniak testified he liked John. Lacyniak also testified they were not arguing before the fight; rather John was "pleading his case." Further, John was not brandishing a weapon when Lacyniak claims John threatened him. And even if John did threaten him, Lacyniak's described reaction was to respond in kind and prepare for a fist fight. All these factors weigh against finding Lacyniak reasonably believed he was in danger of life or great bodily injury. What is more distinguishing, this incident was captured on video and as explained, the video contradicts critical aspects of Lacyniak's account. In *White*, the State did not have the benefit of video evidence to potentially refute White's version of events.

¶ 35     Rather than *White*, we find this case is more like *People v. Leahy*, 229 Ill. App. 3d 1070 (1992), *People v. Rodriguez*, 258 Ill. App. 3d 579 (1994), and *People v. Harmon*, 2015 IL App (1st) 122345. In each of those cases, a defendant used a deadly weapon against an unarmed person in an altercation that was no more than a street fist fight. Furthermore, in each case the victim had

first punched the defendant or a friend of the defendant. The appellate court found none of these defendants were justified in using deadly force under self-defense; either the defendant could not have reasonably believed they were in danger of death or great bodily harm or the victim's battery on the public way did not constitute a forcible felony to justify the use of deadly force. Here, the evidence was likewise sufficient to find the same.

¶ 36    For these reasons, the jury's finding that Lacyniak's killing of John was not justified as self-defense was not so unreasonable, improbable, or unsatisfactory as to cause a reasonable doubt of his guilt.

¶ 37                    B. Unreasonable belief in self-defense

¶ 38    We turn next to Lacyniak's contention that his conviction should be reduced to second degree murder based on an unreasonable belief in self-defense. Second degree murder is a lesser mitigated, not lesser included offense, of first degree murder with the same elements and required mental state. *People v. Staake*, 2017 IL 121755, ¶ 40. However, a first degree murder is mitigated to second degree when "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing [under self-defense], but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(1)-(2) (West 2012). Thus, the defendant bears the burden to prove by a preponderance of the evidence that (1) unlawful force was threatened against him, (2) he was not the initial aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, and (5) he subjectively believed a danger existed that required the use of force. *Jeffries*, 164 Ill. 2d at 129. Whether the defendant's actions were committed under these factors is a question of fact for the jury to resolve. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43. When reviewing a defendant's claim that he proved he acted under an unreasonable belief in self-defense, we consider "whether, after viewing the evidence in the light most favorable to the prosecution,

any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). We must affirm if any rational trier of fact could have found the defendant failed to prove any one of the five *Jeffries* factors listed above. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 160.

¶ 39    As we stated in the prior section, a rational jury could have found that Lacyniak failed to prove he was not the initial aggressor or that his excessive use of force rendered him the aggressor. Likewise, Lacyniak's willingness to fight could lead a rational jury to find he did not subjectively believe force was required. Lacyniak's asserted subjective belief in self-defense relied on his testimony, which the jury was not required to find credible. See *People v. Rutigliano*, 2020 IL App (1st) 171729, ¶ 82 (noting that jury was not required to find defendant's testimony of a belief in self-defense credible).

¶ 40    Further, if the jury found witness testimony concerning Lacyniak's statements after the stabbing credible, his statements belie that he believed he was in fear of his life and needed to use deadly force. The jury could have construed that Lacyniak's insistence that John sucker-punched him as indicative of Lacyniak's elective retaliatory attitude and not a belief that the circumstances left him no choice but to use deadly force. Similarly, Nicole testified that Lacyniak gloated saying, "yeah, what now, n***!" which could be taken as machismo rather than betraying relief from averting a deadly threat. His statement that he was going to get a "strap and take care of this" further reveals a vengeful state of mind. See *Bennett*, 2017 IL App (1st) 151619, ¶ 44 (finding defendant had not proven unreasonable belief in self-defense when evidence showed trier of fact could find defendant was motivated by revenge and anger). Thus, based on the trial record, a reasonable jury could have found Lacyniak had not proven he acted under an unreasonable, subjective belief in self-defense.

¶ 41        To support his argument, Lacyniak likens his case to *People v. Hawkins*, 296 Ill. App. 3d 830 (1998), in which the appellate court reduced a first degree murder conviction to second degree based on unreasonable belief in self-defense. In *Hawkins*, the defendant fatally stabbed the victim, Green, in an altercation on a friend's back porch. Like this case, Green was intoxicated, had punched Hawkins, and kept coming at Hawkins even as Hawkins was wielding a knife. *Id.* at 838. But the evidence also showed that Green: pulled a knife on Hawkins three days before; struck Hawkins with a brick in a prior altercation; knocked Hawkins down before Hawkins pulled out his knife; threw a brick at Hawkins just missing his head; said he was going to kill Hawkins; prevented Hawkins from fleeing; and Hawkins did not know whether Green had something in his hand. *Id.* at 837-38. Taken together, the court found these facts and circumstances showed Hawkins had an actual, but unreasonable belief in self-defense. *Id.* at 837.

¶ 42        Apart from those mentioned, no comparable facts were present in this case. To the contrary, John never attacked or threatened Lacyniak before. Even if John threatened Lacyniak on this occasion, it was not accompanied by an act of violence. Lacyniak remained on his feet the whole time. Lacyniak never tried to flee, nor did John prevent him from doing so. And Lacyniak testified John was only punching with his bare hands. For these reasons, we find *Hawkins* distinguishable.

¶ 43        Overall, a rational jury could have found Lacyniak did not meet his burden to prove by a preponderance of evidence that the offense was mitigated by an actual, but unreasonable belief in self-defense.

¶ 44                                  C. Serious provocation

¶ 45        We next consider Lacyniak's argument that we should reduce his conviction to second degree murder based on serious provocation resulting from mutual combat. This form of second degree murder mitigates first degree murder when "at the time of the killing [the defendant] is

acting under a sudden and intense passion resulting from serious provocation by the individual killed." 720 ILCS 5/9–2(a)(1) (West 2012). Serious provocation is "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9–2(b) (West 2012). Mutual combat is a recognized category of serious provocation. *People v. Chevalier*, 131 Ill. 2d 66, 73 (1989). "Mutual combat is a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *People v. Austin*, 133 Ill. 2d 118, 125 (1989).

¶ 46 Again, to reduce a first degree murder conviction to second degree, the defendant bears the burden of proving the mitigating factor. *People v. Manning*, 2018 IL 122081, ¶ 17; 720 ILCS 5/9-2(c) (West 2012). Whether mutual combat is serious enough to mitigate a first degree murder to second based on provocation is, generally, a matter for the jury. *People v. Garcia*, 165 Ill. 2d 409, 430 (1995). Our standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factor was not established. *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). We will not disturb a jury's finding on this issue unless the evidence is so improbable or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *Harmon*, 2015 IL App (1st) 122345, ¶ 87.

¶ 47 Lacyniak contends that the fight with John was mutual combat resulting from an escalating chain of events that started in the kitchen of Anthony and Erica's apartment and culminated in the altercation after John returned and approached Lacyniak on the street outside of Rocky's. To be sure, the evidence supported that John played a role in instigating the fight as we observed above. Moreover, the fight had some attributes of mutual combat: John and Lacyniak were comparable in age, size, and build; and the video appears to depict two willing combatants regardless of who initiated physical contact. However, a rational jury could find that the knife transformed the

altercation from mutual combat: John and Lacyniak were no longer on equal terms with one armed and the other not and, therefore, the combat was not mutual. For purposes of mutual combat, "the provocation must be proportionate to the manner in which the accused retaliated." *Austin*, 133 Ill.2d at 126–27. "There is no mutual combat where the manner in which the accused retaliates is out of all proportion to the provocation, particularly where homicide is committed with a deadly weapon." *People v. Sutton*, 353 Ill. App. 3d 487, 496 (2004); *People v. Thompson*, 354 Ill. App. 3d 579, 588 (2004). Thus, a rational jury could find stabbing John in the chest with a knife was out of proportion in what was otherwise a fist fight. And, as discussed previously, the jury could find Lacyniak introduced the knife, not John.

¶ 48     Nevertheless, use of a weapon does not necessarily preclude finding serious provocation due to mutual combat. To that point, Lacyniak argues his case is comparable to *People v. Goolsby*, 45 Ill. App. 3d 441 (1977), in which the appellate court reduced a first degree murder conviction to second degree based on mutual combat. In *Goolsby*, the defendant, who worked as a helper for a truck driver delivering newspapers, got into an argument with the driver William Byrne over money. *Id*. at 443-44. While still inside the cab of the truck, the two exchanged punches. *Id*. at 444. Byrne picked up a lead paper weight and hit Goolsby with it several times. *Id*. Goolsby grabbed a knife used to open newspaper bundles hoping that would cause Byrne to stop and enable him to get out of the truck. *Id*. Goolsby did not want to turn his back to Byrne. *Id*. But Byrne grabbed Goolsby and wrestled with him. *Id*. Byrne suffered six stab wounds in the struggle, but only one was fatal. *Id*. at 444-45. The knife pierced Byrne's cheek, penetrated his mouth, and lacerated his carotid artery. *Id*. at 445.

¶ 49     We find *Goolsby* factually dissimilar to this case. Goolsby's resort to use of a knife could be considered proportionate since Byrne first hit him with a lead weight several times. Nothing like

that happened here. John did not use or have any weapon or object before Lacyniak stabbed him with a knife. What is also dissimilar, neither Lacyniak's testimony nor the video indicate he ever tried to make John stop simply by displaying the knife like Goolsby said he did. Further, this fight occurred on a sidewalk and street, not in a confined space like the cab of a truck. Lastly, the fatal injury in *Goolsby* was consistent with a wound sustained "in the course of [a] struggle," as that court put it, when the combatants wrestled. Not so here. Lacyniak purposefully used the knife in the fight to stab John: the stabbing did not occur incidental to a struggle as in *Goolsby*.

¶ 50        Lacyniak testified that after Anthony separated them, Anthony exclaimed, "Are you going to fight or are you going to stab!" Anthony's rhetorical question indicates he perceived that Lacyniak's use of the knife went far beyond just fighting. The jury, who was able to consider all the evidence presented by the State and defense, was in a better position to determine if the stabbing was proportionate in a mutual combat. Their verdict indicates they agreed with Anthony's assessment, and we find the evidence sufficient for them to conclude so. In sum, we do not find the evidence so improbable or unsatisfactory to disturb the jury's determination that the murder was not mitigated by serious provocation based on mutual combat.

¶ 51                                      D. Involuntary manslaughter

¶ 52        Lacyniak next requests us to reduce his conviction to involuntary manslaughter. The difference between first degree murder and the lesser included offense of involuntary manslaughter is the defendant's mental state. *People v. McDonald*, 2016 IL 118882, ¶ 51. Specifically, "[i]nvoluntary manslaughter requires a less culpable mental state than first degree murder." *People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998). A person commits the offense of first degree murder when he kills another individual without lawful justification and by performing actions through which he either intended to kill or inflict great bodily harm on his victim or knew that such acts

created a strong probability of death or great bodily harm to that individual. 720 ILCS 5/9-1(a)(1), (2) (West 2012). In contrast, a person commits the offense of involuntary manslaughter where he unintentionally kills another individual by performing acts that are likely to result in death or great bodily harm of that person and he performs those actions recklessly. 720 ILCS 720 5/9-3(a) (West 2012). Pursuant to statute, "[a] person is reckless or acts recklessly when [he] consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2012).

¶ 53        Notably, the trial court instructed the jury on involuntary manslaughter in this case. Because the jury had the option to return a verdict of guilty of involuntary manslaughter instead of first degree murder, we give their determination deference. Thus, we consider whether, after viewing the evidence in the light most favorable to the State, any rational jury could find the defendant's actions were intentional or knowing and not merely reckless. *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 25. We will only reduce a first degree murder conviction to involuntary manslaughter if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt that the defendant possessed the requisite mental state for first degree murder. *Id*. ¶¶ 25, 38.

¶ 54        Generally, courts called upon to determine whether a defendant acted recklessly consider: (1) any disparity in size and strength between the defendant and the victim; (2) the brutality and duration of the altercation and severity of the victim's injuries; (3) whether the defendant employed the use of a weapon, such as a knife or a gun to inflict the victim's injuries; (4) whether the victim sustained multiple wounds and injuries; and (5) whether the victim was defenseless. *People v. Himber*, 2020 IL App (1st) 162182, ¶ 31. In this case, Lacyniak argues these factors and other

circumstances show his actions were only reckless because: he and John were comparable in size; Anthony testified, and the video showed, he swung the knife "awkwardly;" he stopped fighting after Anthony pulled John away; and Erica testified that he said he was sucker punched and did not know what happened. Furthermore, he remained on the scene and turned himself in. Above all, he states the stabbing was not particularly brutal.

¶ 55        Viewing the evidence in the light most favorable to the State, a rational jury could find that Lacyniak's actions were not merely reckless. While we agree the video shows Lacyniak sometimes swing the knife in a manner that could be described as awkward, that description only fits the last moments of the fight when Lacyniak appears to swing downward at John's forearms, which occurred after Lacyniak had twice stabbed John in the chest. Earlier, Lacyniak thrust the knife at John in a markedly different manner, including, as we described above, the vicious uppercut following a feint. When viewing the video, Lacyniak's repeated thrusts with the knife, including the two that struck John's chest and pierced his heart, could easily be construed as intentional. Moreover, we believe the actions could be characterized as brutal, especially considering Lacyniak inflicted more than one deep stab to the chest, and it proved fatal. In addition, the video shows that Lacyniak wielded the knife in his right hand for most of the 45 second fight and his right arm motions are consistent with deliberate attempts to stab, not punches with a hand that happened to hold a knife.

¶ 56        In our view, Lacyniak used the knife in a manner analogous to a person who points a gun in the direction of an intended victim and shoots. We have consistently held such conduct is not merely reckless, regardless of whether the defendant asserts he did not mean to kill anyone. *People v. Sipp*, 378 Ill. App. 3d 157, 164 (2007). The same could be said here. Lacyniak's conduct shown

on the video belies that he did not intend to stab John. Likewise, his assertions to the contrary are insufficient to support involuntary manslaughter.

¶ 57    For his argument, Lacyniak relies on *People v. Whiters*, 146 Ill. 2d 437 (1992), in which a defendant's conviction related to a stabbing death was reversed and remanded for a new trial, in part, because she should have received an instruction on involuntary manslaughter. In *Whiters*, a woman fatally stabbed her boyfriend in the abdomen after they argued, he pushed her, ripped the phone from the wall, and threatened to "kick her ass." *Id.* at 440. The stabbing occurred when Whiters grabbed a kitchen knife, held it at her waist, and the boyfriend moved toward her. *Id*. at 440-41. Whiters also screamed that she did not mean to hurt him and called for help immediately. *Id*. If believed by a jury on retrial, they could find Whiters's conduct reckless. *Id*. at 441.

¶ 58    We do not believe *Whiters* compels a reduction to involuntary manslaughter in this case. Importantly, *Whiters* only held that the defendant was entitled to an instruction on involuntary manslaughter and noted the caveat that such a verdict would result only if the jury believed her testimony. Here, the jury was instructed on involuntary manslaughter and their verdict indicates they believed the evidence proved Lacyniak's conduct was not merely reckless. We see no basis to disturb their determination.

¶ 59    For these reasons, we do not find the evidence so improbable or unsatisfactory that it creates a reasonable doubt that Lacyniak possessed the requisite mental state for first degree murder.

¶ 60                                E. Initial aggressor instructions

¶ 61    Last, Lacyniak avers the trial court erred by giving two instructions over his objection in which the jury could consider whether he was the initial aggressor and, if it so found, it should limit its application of the justification of the use of force. The instructions Lacyniak challenges as erroneously given are Illinois Pattern Jury Instructions, Criminal, Nos. 24-25.09 and 24-25.11 (4th

ed. 2000) (IPI Criminal No. 24-25.09 and IPI Criminal No. 24-25.11). The first instruction as given in this case provides:

> A person who initially provokes the use of force against himself is justified in the use of force only if the force used against him is so great that he reasonably believes he is in imminent danger of death or great bodily harm, and he has exhausted every reasonable means to escape the danger other than the use of force which is likely to cause death or great bodily harm to the other person.

IPI Criminal No. 24-25.11 states:

> A person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon the other person.

Lacyniak argues these instructions should not have been given because the evidence did not support that he was the initial aggressor or provoked the use of force. Due to these instructions, he posits, the jury did not fully consider whether his use of force was justified.

¶ 62     In a criminal case, the State and defendant are both entitled to have the jury instructed as to their theories of the case, and even slight evidence regarding a theory justifies an instruction. *People v. Salcedo*, 2011 IL App (1st) 083148, ¶ 37, *abrogated on other grounds*, *People v. Bailey*, 2014 IL 115459. Reviewing courts defer to the trial court's decision as to whether sufficient evidence supports a particular jury instruction. *McDonald*, 2016 IL 118882, ¶ 38. We review only for an abuse of discretion. *Id.* ¶ 42. An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *Id.* ¶ 32.

¶ 63     The initial aggressor instructions are properly given if the State presents evidence showing the defendant to be the aggressor or there is a question of whether the defendant was the aggressor. *Rutigliano*, 2020 IL App (1st) 171729, ¶ 78. When an initial aggressor instruction is given

- 26 -

alongside justifiable use of force instructions, the court is not assuming that the defendant was the initial aggressor but allowing the jury to resolve the evidence pursuant to either hypothesis. *Id.*

¶ 64    As discussed previously, some evidence supported that John initiated the altercation, but the jury could have found Lacyniak was the aggressor despite it. Evidence could have been construed to conclude Lacyniak hit John first, that Lacyniak produced the knife, and that his use of it was so disproportionate to render him the aggressor. It was for the jury to decide which actions constituted aggression. Accordingly, the trial court did not abuse its discretion by giving these instructions.

¶ 65                                    III. CONCLUSION

¶ 66    Based on the foregoing, we find the evidence was sufficient to prove Lacyniak guilty of first degree murder beyond a reasonable doubt. The jury could properly reject his claim of self-defense, find Lacyniak did not prove a mitigating factor to reduce the offense to second degree murder, and find he was not merely reckless to reduce the offense to involuntary manslaughter. Further, we find the court did not abuse its discretion by instructing the jury on use of force by an initial aggressor. Accordingly, we affirm the conviction for first degree murder.

¶ 67    Affirmed.